(C.D. 2315)

VENT AIR CONTACT LENS LABS. ROHNER GEHRIG & CO., INC. } v. UNITED STATES

United States Customs Court, First Division

(Decided February 14, 1962)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs. *William H. Orrick, Jr.*, Assistant Attorney General (*Mollie Strum* and *Harold L. Grossman*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

OLIVER, Chief Judge: This protest relates to certain metal contact lens cases with foam pads and plastic inserts fitted therein. The three items were assessed with duty as an entirety at the rate of 55 per centum ad valorem under the provision in paragraph 1527(c)(2) of the Tariff Act of 1930, as modified by T.D. 53865, supplemented by T.D. 53877, for—

> Articles valued above 20 cents per dozen pieces, designed to be worn on apparel or carried on or about or attached to the person, such as and including buckles, card cases, chains, cigar cases, cigar cutters, cigar holders, cigar lighters, cigarette cases, cigarette holders, coin holders, collar, cuff, and dress buttons, combs, match boxes, mesh bags and purses, millinery, military and hair ornaments, pins, powder cases, stamp cases, vanity cases, watch bracelets, and like articles; all the foregoing and parts thereof, finished or unfinished, composed wholly or in chief value of metal other than gold or platinum (whether or not enameled, washed, covered, or plated, including rolled gold plate), * * *:
>
> > Articles and parts (not including parts valued under 20 cents per dozen) valued not over $5 per dozen pieces or parts (* * *)_____ 55% ad val.

Plaintiffs do not dispute the collector's classification of these items as an entirety, but contend that the merchandise is properly dutiable at only 20 per centum ad valorem under the provision in paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108, for articles, not specially provided for, composed wholly or in chief value of base metal, and not plated with platinum, gold, or silver, or colored with gold lacquer.

From an examination of the sample in evidence (plaintiffs' exhibit 1), it appears that the article in question is a small metal case, approximately 1¾ inches long, 1 inch wide, and one-half inch high. An ornamental design embellishes the cover, and the base has been embossed with a decorative effect. Hinges and a clasp fitted to the case enable it to be firmly and securely closed. The base of the interior has a plastic insert, made with two circular depressions, approximately one-half inch in diameter and one-sixteenth of an inch in depth, be-

hind which is a tubular depression, about 1 inch long and one-sixteenth of an inch deep. Inside the lid or cover of the case, and covering the entire area, is a foam sponge or pad. Viewing the case in its entirety, it is an attractive container, convenient for carrying on or about the person. It is agreed between the parties that the article in question is in chief value of metal, that it is not plated with platinum, gold, or silver, and that it is not covered with gold lacquer. (R. 3–4.)

Plaintiffs' direct testimony was offered by the production manager of the Vent Air Contact Lens Laboratories, a manufacturer and distributor of contact lenses and related supplies. The witness characterized the article in question as a combination soaking kit and carrying case, to hold contact lenses when they are not in the eyes. Explaining its function as a soaking kit, the witness stated that the case holds the contact lenses in solution in the two circular depressions that are specifically made to fit the lenses. This is usually done overnight when the lenses are not in use. The importance of keeping the contact lenses in a moist condition was explained by the witness as follows (R. 13) :

* * * It has been brought out that the lenses do have some absorption to them and if the lens is worn in your eye and you take it out and do not keep it moist or wet it will lose some of the moisture. Therefore, when the lens is reinserted onto the eye it would take a few hours for your eye to get accustomed to it again. Therefore, it is recommended that when a lens is not in use that it be kept soaked.

Referring to the use of this article as a carrying case, the witness stated that it is so used during the so-called "adaption period," which he described as follows (R. 8) :

* * * When you first start wearing contact lenses it's not the same as glasses, you don't just put the glasses on your eyes and go merely about your way. You have to build up a wearing period, adaption period to the lenses. This varies anywhere from three, four days, to two weeks, depending upon the person. During that initial period when you are adapting yourself to the lenses the lenses are to be worn on your eye from possibly two to three hours and then a half hour off, or an hour, and then reapplied on your eyes for another three or four hours. During this period it is necessary to carry your lenses with you and therefore you carry the case with you. * * *

The witness' testimony, emphasizing that the contact lens case in question is used overnight for immersing the lenses in solution and only carried during the "initial break-in period of a few weeks," has reference to such use of Vent Air lenses, a product of the witness' employer, and his statement that "as far as we are concerned after the two-week period you are able to wear your lenses all-day" is based on an alleged improved quality of Vent Air lenses. Asked by the court whether there is any significance in the fact that this contact lens case (exhibit 1, *supra*) is "very ornately decorated" (R. 26), the witness answered that when people purchase contact lenses "they showed

that they would like to have something a little more ornate to carry with them." (R. 26.)

The witness identified a contact lens container made of cardboard (plaintiffs' exhibit 2) which he called "a mailer," that "is used to dispense lenses to patients at the time of their purchase to carry the lenses with them in a case where they have a wearing schedule to follow and they must take their lenses out after two hours wear * * *."

On cross-examination, the witness admitted that wearers of contact lenses frequently remove them during the course of a day and place them in carrying cases like the article under consideration.

Defendant introduced the testimony of five witnesses. The first witness testified that he has been a manufacturer of contact lenses for 20 years, and that, during the same period, he has been a licensed optician. He stated that he has sold thousands of contact lenses to doctors, as well as to wearers of such lenses. He identified the article in question (exhibit 1, *supra*) as a contact lens carrying case and produced another class or type of contact lens case (defendant's exhibit A), made of white plastic, tubular in shape, approximately seven-eighths of an inch long and one-half inch in diameter, and made to open at both ends for insertion of a contact lens at each end, which contains a rubber sponge to absorb a small amount of liquid. Referring to the cardboard container (exhibit 2, *supra*), the witness stated that it is used for mailing contact lenses between doctors and laboratories and that such an article is never given to patients to hold contact lenses, because it is wholly impractical for the purpose. The witness testified, further, that he fits patients with the contact lenses; that, in his sale of the lenses, purchasers are always supplied with a carrying case; and that, based upon his personal observation, users of contact lenses always carry a case, either in a purse or a pocket, as a convenience to hold the lenses when they are not in the eyes.

Two doctors of optometry, who are also wearers of contact lenses, also testified on behalf of defendant. They stated that, as users, they always have a carrying case, because it is so convenient for holding the lenses when they are not in the eyes, and that, as doctors, they always recommend to wearers of contact lenses the use of a carrying case, for reasons, stated by the witness, Dr. William Morganstern, as follows (R. 50):

Well, if they are not wearing the lenses you definitely keep them in the case. Now, there are emergency set-ups, for example even if a patient is an all-day wearer, you might be outdoors, you might be in any particular place where a speck of dust or something flies into your eye and you have to get the lens out. You don't want to reinsert them so you put them into the case. If not putting them into the case then I can't see any other particular object that would be advantageous.

Both doctors identified the cardboard container (exhibit 2, *supra*) as a "mailer," that is exclusively used for mailing contact lenses between doctors and laboratories, and characterized the article in question (exhibit 1, *supra*) as a carrying case, equipped to keep contact lenses in a moist condition, which is essential for their proper care and satisfactory use.

Additional testimony of two users of contact lenses is cumulative of defendant's testimony to the effect that wearers have a carrying case with them at all times to hold the contact lenses when they are removed from the eyes, which may occur during the course of a day under different conditions, explained by one of the witnesses as follows (R. 59):

Well, if you get a speck in your eye or lots of times in a smoky room they will become annoying or if you are under tension sometimes they become annoying.

Plaintiffs called as a witness, in rebuttal, the comptroller of Vent Air Contact Lens Specialists, the seller of the contact lenses manufactured by Vent Air Contact Lens Laboratories. The witness merely stated that he wears "Vent Air" contact lenses, that they are designed to be worn all day, and that if a customer finds he cannot wear "Vent Air" contact lenses throughout the day, the purchase price will be refunded by Vent Air Contact Lens Specialists. The witness further testified that he never removes his "Vent Air" contact lenses during the day and that he does not carry any kind or class of contact lens case, except when traveling. On cross-examination, he stated that, during the so-called "breaking-in" period, he used the cardboard container (plaintiffs' exhibit 2), to keep the contact lenses moist when they were not in the eyes.

Plaintiffs' testimony is not impressive toward a favorable consideration of their contention herein. The combined statements of both witnesses relate largely, if not entirely, to the products of their employers. Testimony that the article in question is a carrying case only during the so-called "adaption period" appears to be based on an alleged superiority of "Vent Air" lenses. The evidence adduced by plaintiffs is not sufficient to sustain their dual burden of not only overcoming the presumption of correctness attached to the collector's classification, but, also, of proving that their claim in the protest is the proper classification for the present merchandise.

Defendant's testimony, on the other hand, is persuasive to the effect that wearers of contact lenses frequently find occasion to remove their lenses at different times; that, to meet their requirements, they carry, at all times, as an article of convenience, a carrying case; and that the article involved herein is such a contact lens carrying case. The sample before us (plaintiffs' exhibit 1) lends support to this conclusion. The ornamental design applied thereto is to satisfy users of

contact lenses, who, as stated by plaintiffs' witness, "showed that they would like to have something a little more ornate to carry with them." (R. 26.) The size, shape, and general light construction, as well as the interior fittings—plastic insert and foam pad—are salient features of the carrying case, which, in conjunction with the testimony of defendant's witnesses, bring the article under consideration within the category of merchandise that, in its customary use, is carried on or about the person as an incidental article of mere personal comfort or convenience, which is the fundamental requisite, under a line of judicial pronouncements, enunciated in cases arising under different tariff acts, for classification of merchandise under the provision for articles "designed to be worn on apparel or carried on or about or attached to the person." *Gallagher & Ascher et al.* v. *United States*, 6 Ct. Cust. Appls. 105, T.D. 35343, that related to paragraph 356 of the Tariff Act of 1913; *United States* v. *Horstmann Co.*, 14 Ct. Cust. Appls. 443, T.D. 42079, that involved paragraph 1428 of the Tariff Act of 1922; and *United States* v. *Astra Trading Corp.*, 44 C.C.P.A. (Customs) 8, C.A.D. 627, which invoked paragraph 1527(c)(2) of the Tariff Act of 1930, as modified. The standards followed in all of the cited cases for classifying merchandise under the provisions invoked herein by the collector are comprehensively set forth in the *Gallagher & Ascher* case, the earliest of the three cited authorities. That case involved certain "prorepel" lead pencils, composed entirely of base metal, except that some of them had imitation precious stones set in their top ends. Referring to the provision for articles "designed to be worn on apparel or carried on or about or attached to the person," the appellate court stated as follows:

* * * By that provision a duty is imposed upon articles of a certain value composed of metal, which are designed to be worn on apparel or carried on or about or attached to the person, such as and including buckles, card cases, etc. The controlling question in this provision, outside of the question of value and material, seems to be whether the articles in question are designed to be worn on apparel or carried on or about or attached to the person in the same manner as are the enumerated articles and like articles when in their customary use. If the assessed articles do not resemble the enumerated ones in that particular, then they would not fall within the present provision, whatever might be their resemblance to the exemplar articles or some of them in any other particular. On the other hand, if the assessed articles are similar to the prescribed exemplars in respect to the manner in which they are worn or customarily carried upon the person, then the resemblance is sufficient to satisfy the terms of the provision. The rule of *ejusdem generis* is thus limited by the paragraph to the single controlling resemblance just defined.

It may be observed that the articles which are enumerated in the disputed provision are numerous and in some respects diverse. Some of them are wholly ornamental in character, for example, "vanity cases" and "millinery ornaments"; some are wholly utilitarian, for example, "cigar cutters" and "match boxes"; some may be both ornamental and useful, for example, "chains" and "cuff

buttons." In one particular, however, they are all alike, and that is that in their customary use they are all carried upon the person of the user, not for warmth or protection like clothing, but rather as incidental articles of mere personal comfort, convenience, or adornment. This characteristic belongs also to the metal pencils now in question, and brings them within the provision for "like articles," which follows the list of enumerated articles in the paragraph.

The contact lens case in question meets the status of an article of convenience, classifiable under said modified paragraph 1527(c)(2), within the pronouncement in *United States* v. *R. J. Saunders & Co., Inc.*, 45 C.C.P.A. 63, C.A.D. 674, wherein the court, after quoting from the *Gallagher & Ascher* case, stated as follows:

It is evident that the requirement as to "convenience" in the quoted excerpt is satisfied by articles which merely serve to hold a number of readily accessible small objects together, since that is the function of card cases, cigar cases, coin holders and match boxes, all of which are enumerated in the paragraphs in question. That is the function also performed by the key rings here involved, which serve to hold keys together for convenient access. In view of that fact, and since they are customarily carried upon the person, we are of the opinion that such key rings are *ejusdem generis* with the enumerated exemplars of paragraph 1527(c)(2) of the 1930 Tariff Act, and were properly classified under that paragraph by the collector.

The same is true with respect to the contact lens case under consideration. It merely serves to hold contact lenses for convenient access and, being an article that is customarily carried on or about the person of the user, it is within the class of articles provided for under paragraph 1527(c)(2), as modified, *supra*.

Cases cited in counsel's brief, to support plaintiffs' contention, are distinguishable. *United States* v. *Kress & Co.*, 13 Ct. Cust. Appls. 66, T.D. 40885; *United States* v. *Chichester & Co.*, 14 Ct. Cust. Appls. 71, T.D. 41579; and *M. Pressner & Co.* v. *United States*, 36 Cust. Ct. 262, C.D. 1784. In the *Kress* case, the merchandise consisted of "heavy steel key rings attached to steel snap hooks having leather loops." The *Chichester* case involved aluminum combs, in paper slide cases imitating leather, which were not of pocket size. The *Pressner* case related to certain metal dime savings banks, designed to hold 50 dimes, and which could not be emptied until filled. In all of those cases, the merchandise was excluded from the provision for articles "designed to be worn on apparel or carried on or about or attached to the person" upon a finding, based on record evidence in each case, that the particular article involved therein was not designed to be carried on or about or attached to the person. The same is not true with respect to the contact lens case involved herein. This contact lens case is designed to be carried on or about the person, and is customarily carried by users of contact lenses, as an article of mere personal convenience. It is, therefore, clearly within the class or kind of articles contemplated by the provision of paragraph 1527(c)(2), as modified, *supra*, as classified by the collector.

On the basis of the present record and for all of the reasons hereinabove set forth, we hold the merchandise in question to be properly dutiable at the rate of 55 per centum ad valorem under paragraph 1527(c)(2), as modified by T.D. 53865, supplemented by T.D. 53877, as assessed by the collector.

The protest is overruled and judgment will be rendered accordingly.